IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

BOARD OF REGENTS OF THE          )
UNIVERSITY OF NEBRASKA, and      )
UNEMED CORPORATION,              )
                                 )
            Plaintiffs,           )                    4:09CV3075
                                 )
      v.                          )
                                 )
SIEMENS HEALTHCARE               )        **MEMORANDUM AND ORDER**
DIAGNOSTICS, INC.,               )
                                 )
            Defendant.            )
                                 )

        This is a patent infringement case in which the Board of Regents of the
University of Nebraska and UNeMed, an affiliate of the University ("University"),
allege that Siemens Healthcare Diagnostics, Inc. ("Siemens"), has marketed and sold
a device and system for testing medical samples that infringes upon the University's
two patents entitled "Method for automatic testing of laboratory specimens" ("the
'415 patent" & "the '670 patent"[1]).

        A patent must "describe the exact scope of an invention and its manufacture to
'secure to [the patentee] all to which he is entitled, [and] to apprise the public of what
is still open to them.'" *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373
(1996) (quoting *McClain v. Ortmayer*, 141 U.S. 419, 424 (1891)). A patent contains
two elements that further these objectives: (1) a "specification describing the

_____

        [1]The University alleges that it owns title to U.S. Patent No. 5,614,415 ("the
'415 patent") and U.S. Patent No. 5,985,670 ("the '670 patent").

invention 'in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same'"; and (2) one or more "'claims,' which 'particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention.'" *Markman*, 517 U.S. at 373 (quoting 35 U.S.C. § 112). A patent "claim" defines the scope of a patent and serves to prohibit exact copies of an invention, as well as a product that goes to "'the heart of an invention but avoids the literal language of the claim by making a noncritical change.'" *Id.* (quoting H. Schwartz, *Patent Law and Practice* 1, 82 (2d ed. 1995)).

In order to prevail in a patent infringement lawsuit, a patent "claim" must "'cover[] the alleged infringer's product or process,' which in turn necessitates a determination of 'what the words in the claim mean.'" *Markman*, 517 U.S. at 374 (quoting Schwartz, *supra*, at 80). Here, the parties dispute the meaning of several terms used in the claims of the '415 and '670 patents. The court, and not the jury, must resolve claim-construction disputes. *Markman*, 517 U.S. at 388-89; *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

## CLAIM CONSTRUCTION PRINCIPLES

In construing claims of a patent, the court examines intrinsic evidence, including the language of the claims themselves, the specification, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). Words of a claim are generally given their "ordinary and customary meaning," which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312-13. Further, the claim terms must be read "in the context of the entire patent, including the specification." *Id.* at 1313. While a patentee may give special definitions to claim terms in the patent's specification, "the specification cannot support a definition that is contrary to the

ordinary meaning of a claim term unless it communicates a deliberate and clear preference for this alternative definition." *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).

The prosecution history, which is part of the "intrinsic evidence" to be considered by the court in construing patent terms, "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. Like the specification, the prosecution history "was created by the patentee in attempting to explain and obtain the patent," and this history "provides evidence of how the PTO and the inventor understood the patent." *Id.* However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

Finally, a district court may also consider "extrinsic evidence" consisting of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (internal quotation marks omitted). However, extrinsic evidence "is less significant than the intrinsic record in determining the legally operative meaning of claim language" because (1) such evidence "is not part of the patent and [was not] created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning"; (2) "extrinsic publications may not be written by or for skilled artisans and therefore may not reflect the understanding of a skilled artisan in the field of the patent"; (3) "there is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question" from which each party will select the evidence that most favors them, leaving the court "with the considerable task of filtering the useful extrinsic evidence from the fluff"; and (4) "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records

consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents." *Id.* at 1318-19 (internal quotation marks omitted).

A district court may decline to construe a patent term for the reason that it carries its plain and ordinary meaning; however, failing to construe a patent term for this reason "may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361 (in deciding that "only if" needed no construction because term was well-understood, district court failed to resolve parties' dispute, which centered upon the *scope* that should be encompassed by the claim language; proper claim construction required district court to determine what claim scope was appropriate in context of patents-in-suit).

> "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."

*Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)*).

## CONSTRUCTION OF DISPUTED CLAIMS

Using the principles of claim construction described above, and after considering the briefs, evidence, and arguments presented by counsel, I construe the disputed terms of the '415 and '670 patent as follows:

**A.  U.S. Patent No. 5,614,415 ("the '415 patent")**

| CLAIM NUMBER | CLAIM TERM | COURT'S CONSTRUCTION |
|---|---|---|
| 1 | marking | placing an external visual symbol or identification code on the object (carrier or container) |
| 1,2 | entering | physically introducing |
| 1,3 | calculating | determining |
| 1,3,5 | priority | relative importance |
| 1,2 | workstation | a component of a laboratory automation system that performs a test |
| 1 | highest priority test | test of the highest relative importance |
| 1,2 | predetermined | ** |

**B.  U.S. Patent No. 5,985,670 ("the '670 patent")**

| CLAIM NUMBER | CLAIM TERM | COURT'S CONSTRUCTION |
|---|---|---|
| 1,2 | marking | placing an external visual symbol or identification code on the object (carrier or container) |

5

| 1 | the same machine readable code as said first container | the same type of machine readable code as said first container |
|---|---|---|
| 1,2 | predetermined | ** |
| 1,2 | marked | having an external visual symbol or identification code |
| 1,2,3 | workstation | a component of a laboratory automation system that performs a test |

## C.  Construction Analysis

To allow for meaningful appellate review, I am required to discuss these claim-construction findings. *Nazomi Communications, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1371 (Fed. Cir. 2005) (remanding for further claim construction; in order for appellate court to provide meaningful scrutiny of district court's claim construction, district court must articulate "sufficient findings and reasoning"; while district court provided some claim construction analysis, "this analysis is inadequate because it does not supply the basis for its reasoning sufficient for a meaningful review"); *see also Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 791 (Fed. Cir. 1995) ("The entire omission of a claim construction analysis from the opinion, and the conclusory factual findings on infringement, each provide an independent basis for remand. Because insufficient findings preclude meaningful review by this court, we remand.").  Therefore, my rationale for the constructions is explained below.

### 1.  "Marking" and "Marked"

The claim language surrounding the use of the word "marking" supports the construction that "marking" and "marked" mean "placing an external visual symbol

6

or identification code on the object (carrier or container)." The '415 patent requires "marking" a carrier with "an identification code," and the '670 patent requires "marking" a container and carrier with "a machine readable code." The plain claim language shows that "marking" and "marked" require an external (and visual) code because the dependent claims make clear that "marking" results in the placement of codes "on"—not "in" or "within"—the carrier and container. *See Phillips*, 415 F.3d at 1314 (context of disputed term, including use of other claim terms, is instructive in proper constructions).

For example, after the marking step, dependent claim 4 of the '415 patent recites "providing a sensor at each gate along the conveyor system for reading *the identification code on a carrier* . . . ." (Filing 64-3, Ex. C, '415 Patent, Claim 4 (emphasis added).) Likewise, dependent claim 2 of the '670 patent recites "inputting information into the computer database . . . including information as to . . . *the code marked on the second container* and the second carrier . . . ." (Filing 64-4, Ex. D, '670 Patent, Claim 2 (emphasis added).) Thus, "marking" plainly requires placing an external visual code "on" the carrier and container, as opposed to an internal (thus invisible) code in (or embedded within) the carrier and container.

Second, the court's construction is confirmed by the specifications of both patents, which state that after the carrier or container is "marked," the code appears "on" the object:

> As carrier 26 moves along conveyor 24, it will pass within the zone of workstation 28 where a sensor 38 will detect the identification code *on* carrier 26.

(Filing 64-3, Ex. C, at 4:36-41; *see also* Filing 64-4, Ex. D, at 4:16-19 (same "on" language) (emphasis added).)

7

The specifications also confirm the court's construction because the patents' sole embodiment marks with a bar code, which is an external, visual code:

> The inventor has found that a conventional *bar code label* applied to the specimen container is a simple and efficient method for fulfilling this function. . . . In the preferred embodiment of the invention, sensor 38 is a bar code reader while the identification code on the carrier 26 is a bar code.

(Filing 64-3, Ex. C, at 3:59-65, 4:36-41; Filing 64-4, Ex. D, at 3:41-43, 4:19-21 (same) (emphasis added).) While the fact that a patent describes a single embodiment does not mean the patent claims must be construed as being limited to that embodiment, the embodiment may inform the court regarding how a person of ordinary skill in the art would understand the claim terms, which is the issue upon which the court's focus should remain. *Phillips*, 415 F.3d at 1323.

The prosecution history also confirms that the patent examiner equated "marking" to "labelling" the carrier and containers, which implies that an external code is applied. (Filing 64-5, Ex. E, at SHD001435 (First Rejection) (examiner characterizing "marking" step as "labelling" both the specimen and container).) Likewise, the applicant argued that, unlike the claimed "marking" steps, in the prior art "[t]here is no teaching or suggestion to apply a label to a specimen container carried on the carrier, nor to automatically apply these labels to the separate units prior to placing the units on the conveyor system." (*Id*. at 1450 (First Amendment).)

The court's construction is further confirmed by the ordinary meaning of "mark." *See Phillips*, 415 F.3d at 1314 (claim construction can involve "little more than the application of the widely accepted meaning of commonly understood words," as supported by "general purpose dictionaries"). As a matter of common sense and experience, to "mark" something means to make a visible impression on the external surface of an object. This common understanding is confirmed by dictionary

8

definitions of "mark" as a "visible impression on a surface" and "[a] visible trace or impression on something." (Ex. I-4, *Webster's Desk Dictionary* 278 (1993); Ex. I-2, *The American Heritage Dictionary* 417 (1989); *see also* Ex. I-3, *Webster's II New College Dictionary* (1995) (mark: "A visible trace or impression, as a spot, dent, or line . . . A visible sign or symbol, as a badge or brand . . .").)

### 2. "Entering"

The claim language establishes that "entering" means "*physically* introducing" because the object that is "enter[ed]" is a physical object—the first "carrier." (Filing 64-3, Ex. C, Claim 1 ("*entering* the *first carrier* into the LAS . . . .") (emphasis added).) The "first carrier" plainly is a physical object because, among other things, it is marked with a code, the first specimen is placed into it, and it is directed to a workstation for specimen testing. (*Id.*)

Whereas the inventor used "entering" to refer to the physical introduction of the carrier, he used a different term—"inputting"—to refer to introducing information or data, such as specimen information and test results, into the LIS computer. (*Id.* ("*inputting* information regarding the specimen and tests to be conducted on the specimen into a computerized laboratory information system").) Consistent with the plain claim language, the two terms should not be construed so as to cover the same activity.

Second, the court's construction is supported by dependent claim 2, which discloses the LAS "determining a subsequent location for the first carrier upon *reentry of the carrier onto the LAS conveyor system*." (Filing 64-3, Ex. C, Claim 2.) This language confirms that "entering" in claim 1 means "physically introducing" because "reentry" in claim 2 expressly refers to determining a (physical) location of the carrier after (physical) reentry of the carrier onto the LAS conveyor system.

Third, the specification further confirms the court's construction.  For example, the specification confirms that a physical specimen is "entered" into the LAS in claim 1, not information or data, as would arguably be covered by Plaintiffs' construction: "The *physical specimen(s) obtained from the patient is then entered in the laboratory automation system (LAS)* designated generally as box 20." (*Id.* at 3:43-47 (emphasis added).)  The specification is consistent with the claim language and further explains that the first carrier is "entered" when physically directed onto a conveyor, to which it is later physically returned.

> The carrier is then *entered into the LAS by directing the carrier onto a conveyor or other transport media* connecting all of the workstations of the laboratory. . . . After completion of a test, a carrier is *returned to the conveyor or other transport media of the LAS* and directed to any subsequent workstations for other testing . . . .

(*Id.* at 2:56-68 (emphasis added).)

The preferred embodiment, including figure 2, also confirms that "entering" means the carrier's physical introduction onto the LAS conveyor system at the receiving station.  The specification explains that it is "a schematic diagram of *specimen movement throughout the laboratory automation system*." As explained in the specification, "[t]he specimen arrives at a specimen receiving station 22, where the specimen is *entered* on a conveyor system designated generally at 24." (*Id.* at 3:56-59 (emphasis added).)

Finally, when describing the related "reentry" step of claim 2, the specification again confirms that "entry" is a physical introduction of the carrier. Specifically, it explains that after the carrier is physically moved on the system, "reentry" means a physical "reintroduc[tion]" of the carrier onto the conveyor system, followed by a physical "removal from [the] conveyor":

10

> Carrier 26 is then *reintroduced* on conveyor system 24 to follow the closed loop around to the next workstation assigned to the specimen. Once the testing has been completed, the specimens are forwarded to the specimen archiving station 36 for *removal* from conveyor 24 and appropriate storage.

(*Id.* at 4:26-31 (emphasis added).)

Accordingly, the claim language and specification repeatedly show that the carrier is an object that is physically introduced into the LAS, such that the term "entering" in the '415 patent means "physically introducing."

### 3. "Calculating"

I construe "calculating" in the '415 patent to mean "determining" because of the patent's interchangeable use of those two terms.  The '415 patent claims the laboratory automation system "reading the identification code [on the first carrier] and calculating" three different things:

> the priority of the first specimen relative to any other specimens entered into the LAS;

> the priority of each test to be conducted on the first specimen relative to one another; and

> the most direct route from the receiving station to a first workstation for conducting the highest priority test of the first specimen

(Filing 64-3, Ex. C, at 6:13-21.)  The term "recalculating" appears later in claim 1, and the term "calculations" appears in claim 3.

The specification of the '415 patent uses the word "determine" synonymously to describe all of these "calculations." (*Id.* at 2:40-55, 4:10-16.)  Moreover, while the

11

claims of the '415 patent refer to "calculation" of the "most direct route" (*id.* at 6:19-21), the specification states that the laboratory automation system "will *determine* the optimal route to workstation 30, while simultaneously *determining* the priority of the requested test." (*Id.* at 4:62-67 (emphasis added).) The abstract of the '415 patent likewise states that the laboratory automation system "reads the identification code and thereby *determines*" priorities. (*Id.*, Abstract.) *Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 (Fed. Cir. 2000) (abstract properly used in interpreting meaning of claim terms). "Determines" is also used as a synonym for "calculates" in the description of the Summary of the Invention. (Filing 64-3, Ex. C, at 2:11-15) ("A further object is to provide a method for automating a laboratory which determines optional routing to a particular workstation . . . .").

Similarly, during prosecution the University used "determine" as a synonym for "calculate" in summarizing the invention by noting that "[a]t processing station 28, the carrier assignment is entered into the LAS *to determine* which work stations the specimen must utilize, the order in which the stations are to be utilized and any other pertinent information with respect to priority or turn around time." (Filing 64-5, Ex. E, at SHD001480 (emphasis added).)

Neither the claims nor the specification of the '415 patent require that the "calculation" of priorities be accomplished by mathematical computation. One can readily envision "calculations" that require no computation; for example, the calculation of the "most direct route" could involve a determination of which workstations are busy and which are available—not the kind of mathematical computation the defendant's proposed construction requires. Similarly, in some circumstances, calculation of the priority among tests to be conducted on a specimen might involve a simple determination to follow an order given by a health care practitioner. Therefore, "calculating" in claims 1 and 3 of the '415 patent means "determining."

### 4.  "Priority" and "Highest Priority Test"

I construe "priority" in claims 1, 3, and 5 of the '415 patent to mean "relative importance," and "highest priority test" in claim 1 of the '415 patent to mean "test of the highest relative importance."

As described above, claim 1 of the '415 patent specifies a laboratory automation system that reads the specimen carrier's identification code and determines various "priorities," such as "the priority of the first specimen relative to any other specimens entered into the LAS" and "the priority of each test to be conducted on the first specimen relative to one another." (Filing 64-3, Ex. C, at 6:13-21; *see also id.* at 6:31, 6:48, 6:62 (more "priority" language).)  In each of these usages, "priority" connotes the relative importance of either the specimen or the test to be performed on it.

I decline to read "based on a physician's designation" into the meaning of "priority," as Siemens argues, because such a qualification is at odds with the plain meaning of the language of the patent.  While there may be instances where a physician's designation plays some role in the determination of relative priorities made by the LAS, a physician's designation may play no role in other such determinations.  A physician may have no knowledge of other specimens moving through the LAS at the same time as the first specimen, and that physician's designation of the tests to be performed on the first specimen may not impact the LAS's calculation of the relative importance "of the first specimen relative to any other specimens entered into the LAS." (Filing 64-3, Ex. C, at 6:15-16.)  Likewise, a physician's designation may play no role in "the LAS recalculating the priority of the first specimen and any other specimens in the LAS upon directing of the first carrier to the first workstation."  (Filing 64-3, Ex. C, at 6:31-33.)  In addition, one object of the '415 patent "is to provide a method for automating a laboratory which determines optional routing to a particular workstation, and detects any time delays

13

because of other specimens present in a queue at a workstation." (Filing 64-3, Ex. C, at 2:11-15.) Nothing in the '415 patent suggests that such a determination depends on a physician's designation.

After the LAS calculates the priority of the first specimen relative to others and the priority of each test to be conducted on the first specimen, the LAS determines "the most direct route from the receiving station to a first workstation for conducting the highest priority test of the first specimen." (Filing 64-3, Ex. C, at 6:19-21.) The context within which "highest priority test" is used dictates that this phrase must refer to the test of the highest relative importance. There is simply no reason to believe that the term "priority" means something different in the context of the phrase "highest priority test."

**5. "Workstation"**

The claim language and specifications of the '415 and '670 patents refer to "workstations" as individual components of a laboratory automation system, each of which is capable of performing a test.

The specification of the '670 patent makes clear that a predetermined test is performed at each workstation:

> The container is removably mounted in an independent carrier designed to carry an individual specimen of a number of different sizes and shapes through a laboratory to one or more of a plurality of work stations, where *a predetermined test will be performed on the specimen*. Once the carrier has arrived at the predetermined work station, the carrier is removed from the conveyor and a test is conducted on the specimen.

(Filing 64-4, Ex. D, at 2:21-28 (emphasis added).) Further, claim 1 of the '670 patent

14

refers to "work stations" (plural) where "tests" (also plural) are performed.  (*Id.* at 6:2-3, 6:7-9.)

Claim 1 of the '415 patent also indicates that a workstation is any component that is capable of performing at least one test on a specimen.  The first mention of the term provides that the LAS determines "the most direct route from the receiving station to a first workstation for conducting the highest priority test of the first specimen."  (Filing 64-3, Ex. C, at 6:19-21.)   Additional uses of the word "workstation" in claims 1 and 2 of the '415 patent also link "workstation" to the performance of a test: "each workstation adapted to conduct a predetermined test" (*id.* at 6:24-25); "the LAS operating a gate at the first workstation to direct the carrier to a workstation auxiliary conveyor, for conducting a test on the specimen" (*id.* at 6:28-30); "[t]he method of claim 1, further comprising the steps of: conducting the first predetermined test on the first specimen after the step of directing the first carrier to the first workstation auxiliary conveyor."  (*Id.* at 6:34-37.)

The references in the specification of the '415 patent likewise indicate the performance of a test at each workstation.  For example, in describing figure 2, the description of the preferred embodiment recites:

> Thus, if time constraints require that *the test* of workstation 34 be performed first, and that a test of workstation 32 be performed at some time after *the test* of workstation 34, the specimen can travel on conveyor 24 past workstations 30 and 32, directly to workstation 34, for immediate testing.

(*Id.* at 4:21-26; *see also id.* at 4:62-63 ("[i]f the particular test . . . is performed at workstation 30"); *id.* at 5:16-17 ("[o]nce the test performed by workstation 30 has been completed").)

Contrary to Siemens' argument that "workstation" should be construed to mean

15

a "specimen analyzer that performs one or more tests," neither the '415 nor the '670 patents clearly express any intent on the part of the University to limit the generic term "workstation" in this manner. Rather, the patents describe a functional method for the automatic testing of laboratory specimens on a test-by-test basis and never describe a "workstation" as an "analyzer" or "specimen analyzer." Where an inventor relies on "the intended broad scope of the appended claims" in describing his invention, the court should not construe that scope narrowly when the language of the claims does not require or even suggest the narrow construction. (Filing 64-3, Ex. C, at 5:60-6; Filing 64-4, Ex. D, at 5:34-35.[2])   *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1377 (Fed. Cir. 2009) (the meaning of a claim term is only narrowed when the patentee makes a clear and unmistakable surrender of subject matter during prosecution); *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1120 (Fed. Cir. 2004).

## 6.  "Predetermined"

Claim 1 of the '415 patent states that the LAS directs the carrier among a plurality of workstations, "each workstation adapted to conduct a predetermined test." (Filing 64-3, Ex. C, at 6:24-25.)   In the '670 patent, claim 1 uses the term "predetermined" three times in the same sentence to modify a workstation, an order, and a test:

---

[2]Both patents provide:

>   Whereas the invention has been shown and described in connection with the preferred embodiment thereof, it will be understood that many modifications, substitutions and additions may be made which are within *the intended broad scope of the appended claims*.   There has therefore been shown and described an improved method for automatic testing of laboratory specimen.

(Emphasis added.)

said computer tracking movement of said first carrier along said conveyor, and directing the movement of said first carrier according to information in the database regarding the first specimen, to *predetermined* work stations in a *predetermined* order to conduct *predetermined* tests;

(Filing 64-4, Ex. D, at 6:4-9 (emphasis added).)

If a claim term is non-technical, is in plain English, and derives no special meaning from the patent and its prosecution history, then the court has no need to function as a thesaurus. . . . To do so could well encroach upon the factfinder's domain. The "ordinary" meaning of such terms should speak for itself, and the court should avoid merely paraphrasing claim language with less accurate terminology.

Federal Judicial Center, *Patent Case Management Judicial Guide* § 5.1.4.3, at 5-23 (2009); *id.* § 5.2.3.1.2, at 5-39 ("Where 'construing' a claim term would involve simply substituting a synonym for the claim term, it may be appropriate to allow the claim language to speak for itself.")  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court.  Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.").

The evidence before me establishes that "predetermined" is used in the '415 and '670 patents in a non-technical sense to refer to a variety of nouns—tests, workstations, and orders.  Further, the parties have not pointed to intrinsic or extrinsic evidence that would meaningfully add to the plain, ordinary, and commonly understood meaning of "predetermined."  Therefore, I conclude that no construction

of "predetermined" is necessary.[3]

### 7.  "the same machine readable code as said first container"

Claim 1 of the '670 patent requires marking a first container with a "machine readable code" and then marking a first carrier with the "*same* machine readable *code* as said first container."  (Filing 64-4, Ex. D, at 5:44-47 (emphasis added).)  The '670 patent specification states in part:

> At specimen receiving station 22, the carrier 26 is given an identification *code which correlates* with the specimen container, so that the container and carriage may be directed throughout the laboratory automation

---

[3]*See, e.g., Ferguson Beauregard/Logic Controls v. Mega Systems, LLC*, 350 F.3d 1327, 1340 (Fed. Cir. 2003) ("The ordinary meaning of 'predetermine' is 'to determine beforehand.'"); *Abbott Laboratories v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1353 (Fed. Cir. 2003) (affirming district court's definition of "'predetermined amount' as 'an amount determined beforehand'"); *Regents of Univ. Minnesota v. AGA Medical Corp.*, 660 F. Supp. 2d 1037, 1055 (D. Minn. 2009) (because party's proposed construction did "nothing at all" or imposed a requirement not supported by the patent itself, court rejected party's construction; "[A] 'predetermined' shape is necessarily a shape determined in the past, and thus AGA's proposed construction, at first glance, seems to add nothing to the claim language.  A jury will be able to determine whether, once an accused device is deployed in a human body, that device returns to a shape that was determined beforehand—i.e., a predetermined shape."); *GSK Technologies, Inc. v. Eaton Electrical, Inc.*, Nos. 606CV358, 606CV360, 606CV361, 2008 WL 906713, at *7 (E.D. Tex. Apr. 1, 2008) ("[T]he specification supports according 'predetermined' its plain and ordinary meaning. Accordingly, the Court construes 'predetermined count' as 'a count determined beforehand' and 'predetermined level' as 'a level determined beforehand.'"); *O2 Micro Intern. Ltd. v. Samsung Electronics Co., Ltd.*, No. Civ. A. 2:04-CV-323, 2006 WL 1804616, at *4-5 (E.D. Tex. June 28, 2006) (maintaining court's prior construction of "predetermined" as "determined beforehand").

system, even when the specimen container is removed from the carriage for specific testing at a work station.

(Filing 64-4, Ex. D, at 3:34-53 (emphasis added).)

The crux of the parties' construction argument is the meaning of the word "same" in the context of "same . . . code."  Plaintiffs argue that "same" means "correlated," and Defendant argues that "same" is a commonly understood word that requires no construction and should be given its ordinary meaning.

While the meaning of the word "same," standing alone, may be commonly understood, the parties dispute the meaning of this word in the context of the phrase "same . . . code" in the '670 patent.  Because reliance on the ordinary meaning of "same" would not resolve the parties' dispute in this case, it is necessary to construe it.  *O2 Micro*, 521 F.3d at 1361 (in deciding that "only if" needed no construction because term was well-understood, district court failed to resolve parties' dispute, which centered upon the *scope* that should be encompassed by the claim language; proper claim construction required district court to determine what claim scope was appropriate in context of patents-in-suit); *see, e.g.*, *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum.").

The inventor of the '670 patent offered no particular definition of "same" in the specification that could vary its plain and ordinary meaning.  *See Phillips*, 415 F.3d at 1316 (patent specification may reveal special definition given to claim term by patentee that differs from meaning term would otherwise possess; in such cases, inventor's lexicography governs); *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("the specification cannot support a definition that is contrary to the ordinary meaning of a claim term unless it communicates a deliberate and clear preference for this alternative definition").

19

The fact that the specification discloses "correlating" the codes on the carrier and container to track and direct specimens does not mean that the word "same" in the disputed language of claim 1 should be, in effect, read out of the claim and replaced with "correlating."   First, the "correlation" of codes, as described in the specification, could occur whether the codes were the same or different.   Second, Plaintiffs cannot transform the "marking" steps of claim 1—which require marking the first container and first carrier with the *same* code—into a "correlating" step relating to how two coded items are linked, associated, or connected for purposes of the laboratory testing system at issue.   Therefore, I reject the plaintiffs' proposal to construe "the same machine readable code as said first container" to mean "a machine readable code that is correlated with the machine readable code of the first container."

For these reasons, I conclude that a person of skill in the art would interpret the "same . . . code" in claim 1 of the '670 patent to mean that the *type* of code used on the "first container" and "first carrier" must be the same—that is, indistinguishable. For example, the container and carrier must both be marked with bar codes, or they must both be marked with RFID tags, or they must both be marked with some other type of indistinguishable  "code."   The word "same," as used in the disputed claim 1 language, does *not* mean correlated.

Accordingly,

IT IS ORDERED:

1.     The court construes the following terms in U.S. Patent No. 5,614,415 ("the '415 patent") as indicated below:

> (a)     "marking" in claim 1 means "placing an external visual symbol or identification code on the object (carrier or container)"
> (b)     "entering" in claims 1 and 2 means "physically introducing"

      (c)    "calculating" in claims 1 and 3 means "determining"

      (d)    "priority" in claims 1, 3, and 5 means "relative importance"

      (e)    "workstation" in claims 1 and 2 means "a component of a laboratory automation system that performs a test"

      (f)    "highest priority test" in claim 1 means "test of the highest relative importance"

      (g)    no construction of the term "predetermined" in claims 1 and 2 is necessary;

2.    The court construes the following terms in U.S. Patent No. 5,985,670 ("the '670 patent") as indicated below:

      (a)    "marking" in claims 1 and 2 means "placing an external visual symbol or identification code on the object (carrier or container)"

      (b)    "the same machine readable code as said first container" in claim 1 means "the same type of machine readable code as said first container"

      (c)    no construction of the term "predetermined" in claims 1 and 2 is necessary

      (d)    "marked" in claims 1 and 2 means "having an external visual symbol or identification code"

      (e)    "workstation" in claims 1, 2, and 3 means "a component of a laboratory automation system that performs a test";

3.    On or before October 1, 2010, counsel for both parties shall file simultaneous briefs addressing how the above-described constructions affect the pending motion for partial summary judgment (filing 67) and the motion to strike Plaintiffs' evidence (filing 81), and counsel for both parties shall file simultaneous reply briefs on or before October 12, 2010;

     4.     The Clerk of Court shall adjust the court's internal computerized record-keeping system to reflect that the "response due" date for the pending motion for partial summary judgment (filing 67) and motion to strike (filing 81) is October 1, 2010, and the "reply due" date is October 12, 2010.

     DATED this 16th day of September, 2010.

                             BY THE COURT:
                             *Richard G. Kopf*
                             United States District Judge

---

     *This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.